Harris, J.,
delivered the opinion of the Court.
The complainant, by her next friend, brings this bill for the purpose of setting aside two bills of sale made by her to Mrs. Mason for a female slave, one of which was executed on the 8th day of June, 1854, and the other on the 12th day of the same month.
The bill charges that in 1846 complainant was stricken *499 with paralysis, by which she was unable to do any thing towards her own support; was deprived of her powers of locomotion and of speech, and her mental faculties so much impaired as to make her an easy victim to the arts of the crafty and designing; that she was the owner of the slave in controversy, whose services were her only means of support; that this slave had waited upon her during her entire affliction, then a period of about eight years; that she better understood the signs by, which she signified her wants and necessities than any other person, and her services were indispensable to her comfort; that while in this situation, through the importunities of her daughter, Elizabeth Mason, and her husband, John Mason, (the defendants,) she was induced to go to their house to spend a short time upon a visit; and while there, the defendants, taking advantage of her weak and feeble state of body and mind, by excessively kind ’treatment ,and artful persuasion, by false and fraudulent representations and undue influence, procured from her the two bills of sale now sought to be set aside and cancelled.
The alleged inducement to and consideration for these conveyances, was the promise and undertaking of the defendant John Mason to “maintain” complainant “with good and sufficient clothing and boarding in his family during her natural lifethat on the same day after the last conveyance was executed, she, with the slave in controversy, returned to her own home. Mason and wife afterwards requested her to return, which she refused to do. They then demanded the slave, which she refused to surrender to them; and thereupon they brought their action of replevin, under which writ the slave was delivered to them. To enjoin this suit at law, and have said *500 conveyances declared void and cancelled, this suit was brought.
The defendants demurred to the bill, and, upon the disallowing their demurrer by the Chancellor, they put in their joint answer.
The answer admits the helpless condition of complainant, as charged, but denies that they persuaded her to come to their house; on the contrary, that she came of her own accord, seeking refuge and protection from her afflictions and misfortunes; that respondent Elizabeth had waited upon and-watched over her with unceasing diligence night and day for the first twelve months of her affliction, for which services complainant had often said she intended her to have the slave in controversy at her death; that she complained to them of the bad treatment she had received from her son Elliott, and represented her unhappy condition at home; that they “ offered her .the help of their hands, the pretection of their house, and the sympathy of their hearts, with that honesty of purpose and unceasing affection that they thought should always actuate the conduct of children towards an unfortunate parent.” “ Complainant agreed to live with them, and they told her, as she had often promised the girl to Elizabeth, and as she would now have no more use for her, to give her to Elizabeth, to assist her in cooking and doing the house drudgery, as she was weakly and in feeble health.” Complainant required a day to consider of this proposition, and, at the expiration of that time, gave her consent.
“ Respondents then procured R. A. Crawford, an attorney, Alexander Anderson, Robert Mason, and Thomas Lane, to attend and see that the whole transaction was *501 done according to law, and fairly conducted in the view of honest men and in the face of day.”
They deny that complainant was of unsound mind and unable to make a binding contract, though they admit that she was deprived of the power of speech; and they deny all fraud. These are all the material admissions and averments in the answer.
Upon this issue many witnesses were examined, and the proof is voluminous. However, without noticing it in detail, we may safely assume that it fully sustains the following conclusions: first, that although it does not establish that her mental faculties were entirely destroyed, yet it does most clearly appear that they were so much impaired as to render her an easy victim to gross imposition by importunities and undue influence; and, second, that that weakness, such as it was, was taken advantage of in procuring these conveyances. The proof shows that the defendant, John Mason, had expressed his intention to many persons to have a guardian appointed for her, upon the ground that she was not able to protect herself from the impositions of her son Elliott, whé, he alleged, was likely to cheat her out of every thing she had. In his answer, he admits that he had proposed to have a guardian appointed for her, but it was upon the ground that she was physically unable to attend to her business.
This explanation, we think, comes too late, as it was never made until after he had openly declared his intention to “take care of himself;” had got the complainant at his own house, and had induced her to believe that she was badly treated by her said son, and had procured from her a promise that she would convey the slave in controversy to his wife. Having all this arranged, he applied to *502 an attorney to know if be could have a guardian appointed for complainant, because she'was physically unable to manage her business. On being told that it was mental not physical disability that would authorize the appointment of a guardian, he declared that her mind was sound, and in a few days afterwards he requested the attorney to prepare the conveyance for the slave. Ey this conveyance she was deprived of every thing of much value she owned, leaving a grown son and a young daughter about twelve years old wholly unprovided for.
When this conveyance was presented for her signature, she declined to sign it, and held up two of her fingers, which Mrs. Mason interpreted to mean that she desired her two sons sent for. Her son John was sent for, but states in his deposition that he held no communication with her on the subject of the proposed conveyance.
It also appears in the proof that one great difficulty in the defendants’ way in procuring the conveyance was, that it would leave her two children, John and Rebecca, unprovided for. This, however, was obviated by making her believe that she owned the land upon which she lived, and that she also had a fund of some four or five hundred dollars coming to her from her deceased father’s estate, out of which provision could be made for them. This, however, turns out to be untrue. She did not own the land, as defendants well knew, and upon settlement with the administrator, there was but a small amount due her from her father’s estate. It also appears in the proof, that on the day she signed the bill of sale, she was reminded of her dissatisfaction with her son Elliott and the great difficulty she labored under in living at home, and she was advised by the attorney that “ the arrangement *503 sbe was making with Mason would put an end to all suck difficulties,” and thereupon she executed the conveyance. By this conveyance the slave was seemed to the sole and separate use of Mrs. Mason; but, four days afterwards, Mr. Mason told her that there was something wrong in that conveyance, and prevailed upon her to sign the second one, which contains no such provision, and which doubtless was the motive that induced Mason to procure its execution.
It also appears that the facts stated by nearly all the witnesses in relation to this transaction were derived from Mrs. Mason, who professed to interpret the complainant’s signs, and without whose aid they could not understand her. ¡ In this state of the case, upon the application of the defendants, an issue of fact was made up and submitted to a jury: the jury, under the charge of his Honor the Chancellor, found the issue in favor of defendants, which verdict the Chancellor was asked to set aside. This he refused to do, but dismissed the bill; and complainant has appealed to this Court. The issue submitted to the jury was, “Were the bills of sale in the pleadings mentioned made by the said Hyla Gass knowingly, freely, and voluntarily, when she was of sound mind; or were the same executed when she was of unsound mind, or ignorant of their contents, or, by reason of false or fraudulent representations, made to her at or before the time of their execution ?”
Upon the trial of this issue, the Chancellor charged the jury, amongst other things, that “ it is a distinct and valid ground of relief in a Court of Equity, where a person of weak intellect makes an improvident and rash contract, and the circumstances show that advantage was *504 taken of Lis weak and imbecile mind, that such a contract will be set aside in a Court of Chancery. A rash and improvident contract is where a person sells his property for greatly less than its value, or purchases property for an extravagant price — one greatly beyond its value. In such cases a Court of Chancery will closely scan the contract; and if it is found unreasonable and improvident, it will be held void and fraudulent. But if the purchasers give a full and fair price for the property, although the seller may be of weak mind, and much persuasion may have been used to induce him to part with it, the Court will not disturb the contract, although it may have been unwise and improvident.” If the consideration given for the slave was adequate, although it may not have been a prudent or wise contract, it would not be void, notwithstanding the complainant may have been of weak mind, and much persuasion may have been used to induce her to make it. But if the consideration was greatly inadequate, “ and undue influence was used, the contract would be fraudulent and void.” We think that both the issue and charge of the Court, as submitted to the jury, miss the main question presented in this record.
It is most obvious that, by this charge, the validity of these conveyances is made to depend almost exclusively upon the adequacy or inadequacy of the consideration promised, rather than the state of complainant’s mind and the improper influences brought to bear upon that mind at the time they were procured.
The jury are instructed, that “if the purchaser give a full and fair price for the property, although the seller may be of weak mind, and much persuasion may have been used to induce him to part with it, the Court will *505 not disturb tbe contract, although, it may hare been unwise and improvident.” How could it be improvident if a full and fair price was given, according to the previous instruction that an “improvident contract is where a person sells his property for greatly less than its value ?” The effect of the charge is, and it must have been so understood by the jury, that if the consideration was not greatly inadequate, the contract would be valid, although it was obtained from a person of weak mind by importunities and undue influence, no matter how ill-advised and ruinous it may have been to the party in other respects; but if the consideration was “greatly inadequate, and undue influence was used, then the contract would be fraudulent and void.” Such, in our opinion, is not an accurate statement of the law. Mr. Justice Story says that “the law will not assist a man who is capable of taking care of his own interest except in cases where he has been imposed upon by deceit, against which ordinary prudence could not protect him. If a person of ordinary understanding, on whom no fraud has been practiced, makes an improvident bargain, no Court of justice can release him from it. Inadequacy of consideration is not a substantial ground for setting aside a conveyance of property. Indeed, from the fluctuation of prices, owing principally to the gambling spirit of speculation that now unhappily prevails, it would be difficult to determine what is an adequate price for any thing sold.” “ But those who from imbecility of mind are incapable of taking care of themselves, are under the special protection of the law. The strongest mind cannot always contend with deceit and falsehood. A bargain, therefore, into which a weak one is drawn, under the influence of either of these, ought not to be held valid; for the law *506 requires that good faith should he observed in all transactions between man and man. And, addressing himself to the case before him, Lord Wynford said, If this conveyance could be impeached upon the ground of the imbecility of E. only, a sufficient case has not been made out to render it invalid; for the imbecility must be such as would justify a jury, under a commission of lunacy, in putting his property and person under the protection of the Chancellor. But a degree of weakness of intellect, far below that, which would justify such a proceeding, coupled with other circumstances to show that the weakness, such as it was, had been taken advantage of, will be sufficient to set aside any important deed.’ ” See 1 Story’s Eq., § 237. In the next section Mr. Story proceeds: “ The doctrine, therefore, may be laid down as generally true, that the acts and contracts of persons who are of weak understandings, and who are thereby liable to imposition, will be held void in Courts of Equity, if the nature of the act or contract justify the conclusion that the party has not exercised a deliberate judgment, but that he has been imposed upon, circumvented, or overcome by cunning, or artifice, or undue influence.” And again, at section 234, he says that “where a person, although not positively non compos or insane, is yet of such great weakness of mind as to be unable to guard himself against imposition, or to resist importunity or undue influence“ and it is quite immaterial from what cause such weakness arises,” “ for it has been well remarked that, although there is no direct proof that a man is non compos or delirious, yet if he is a man of weak understanding, and is harassed and uneasy at the time, or if the deed is executed by him in extremis, or by a paralytic, it cannot be supposed that he had a mind *507 adequate to tbe business which he was about, and he might be very easily imposed upon.” See also 1 Eonbl. Eq., B. 1, ch. 2, § 3.
These principles have been fully recognized and their authority yielded to by this Court in the case of Craddock vs. Cabiness et al., reported in 1 Swan, p. 474, where relief was granted in a case not so strong as the one now before us; and we think they are decisive of this cause. We have already said that the proof does not show that the complainant was insane; yet it does clearly appear that such was her mental imbecility and her physical inability to communicate such ideas as she had, as to render her an easy victim to importunities, undue influence, and imposition, and that these were all resorted to and successfully used in procuring these conveyances. We have also said that the issue submitted to the jury on the application of the defendants missed the main question in the cause, and was an immaterial issue. The issue should have been, was the complainant, at the time she executed the conveyances, laboring under mental imbecility, and physically unable to communicate such ideas as she had; so much so, as to render her an easy victim to importu-nities, undue influence, and imposition, and were these conveyances procured through these influences ? If this issue had been submitted, and found in the affirmative, as we think it should, then the conveyances should have been set aside and the entire relief prayed for granted. And inasmuch as the party applying for the jury submitted an immaterial issue, we do not think it is proper to remand the cause to have a proper issue — such as the party applying for the jury should at first have tendered — submitted to another jury. But treating the facts as we would if *508 the Chancellor had found them for himself, we reverse the decree dismissing the bill, and order a decree for complainant, giving the entire relief prayed for in the bill. The demurrer to the bill was properly disallowed by the Chancellor. Complainant is a party before the Court. She is neither a lunatic nor insane. Therefore, there was no necessity for a guardian nor a next friend to prosecute the suit; and the fact that Mr. Anderson appears as her next friend upon the record can by no means defeat her suit.
1. Practice. Trial by jury in Chancery Court. Act of 1846, ch. 122, § 14. The party who asks for a jury in the Chancery Court, and submits for their determination an issue of fact, is bound at his peril to submit a proper issue. It is too late, after an appeal to the Supreme Court, to hare the cause remanded for trial upon a proper issue, if the facts are so presented in the record that the Supreme Court can determine them for itself.
2. Same. Same. Same. The act of 1846, ch. 122, $ 14, authorizing trials by jury in the Chancery Court, makes the verdict in such case Conclusive upon the Chancellor as to the facts so tried; but empowers the Chancellor to award a new trial of said issue where a proper case occurs. If the Chancellor, however, abide by the verdict, and shape his decree accordingly, and it appears, upon appeal to the Supreme Court, that the issue decided was not the material issue in the cause, the latter Court, if the facts fully appear, will decide upon them as if adjudicated by the Chancellor, and make such a final disposition of the cause as the facts may warrant.
3. Cases cited. Bledsoe vs. Chouning, 1 Humph., 85; Farnsworth vs. Arnold et al., 3 Sneed, 252.